[No. H027337. Sixth Dist. June 9, 2005.]

In re PETER HONESTO, On Habeas Corpus.

## COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Julie Garland and Pamela B. Hooley, Deputy Attorneys General, for Appellant.

Steve M. Defilippis, under appointment by the Court of Appeal, for Respondent.

## OPINION

**MIHARA, J.**—In August 1984, petitioner Peter Honesto murdered John Re in the course of a kidnapping and attempted robbery. Honesto was tried for capital murder, kidnapping and attempted robbery, but the jury deadlocked. Honesto entered into a plea agreement under which he pleaded no contest to second degree murder and admitted that he had personally used a firearm, and

the kidnapping and attempted robbery counts and the special circumstances allegations were dismissed. Honesto was sentenced to 17 years to life in state prison. He was denied parole in 1994 and 1997. After he was again denied parole in 2001, Honesto filed a petition for a writ of habeas corpus in Santa Clara County Superior Court in which he alleged, among other things, that the denial of parole was a violation of his plea agreement and that it was not supported by some evidence. The superior court issued an order to show cause and subsequently granted his petition. It ordered the Board of Prison Terms (the Board) to hold a new parole hearing and severely restricted the factors that the Board could consider at that hearing. The Board appeals. It contends its denial of parole was not a violation of Honesto's plea agreement and was supported by some evidence of his unsuitability for parole. We agree with the Board and reverse the superior court's order.

## I. The Crime

Honesto was 21 years old at the time of the offense. He had not completed high school and was unemployed. He had been arrested many times, and his adult criminal record consisted of 21 misdemeanor convictions including theft, resisting an officer, giving false information to a peace officer and contempt of court. He had been jailed a number of times. Honesto had also been on probation, but his probation had been revoked.

On August 11 and 12, 1984, Honesto, his brother Manuel David Smith and a man named Dan Kloptan concocted a plan to kidnap and rob John Re. Re was the head clerk at a grocery store near Smith's home, and Smith was upset at Re because Re had once refused to cash a check for him. The three men incorrectly believed that Re had access to the store's safe.[1] They planned to follow him from the store after it closed, kidnap him and force him to return to the store and open the safe for them. The possibility that it would be necessary to kill Re was discussed, and Honesto "knew that he may have to kill the victim."

Re closed the grocery store at 9:14 p.m. on August 12. Honesto and Kloptan followed Re as he drove to his nearby home. Honesto had disguised himself to avoid being identified. When Re drove into his garage, Honesto and Kloptan confronted him and displayed firearms. Honesto had a sawed-off shotgun, and Kloptan had a handgun. Honesto told Re that they were going back to the store, and he accompanied Re in Re's car with Re driving. Kloptan drove behind them in a separate vehicle. While they were en route on

---

[1] This belief was unfounded. Re did not have the combination to the safe.

Highway 101 to the store, Re's vehicle swerved out of the slow lane and struck a vehicle in the fast lane. The vehicle in the fast lane ran into the guard rail.[2] Re's car returned to the slow lane, slowed down and was struck from the rear by a third vehicle.

Immediately after Re's car came to a stop in the slow lane, Honesto was seen climbing over Re out the driver's side window and running away. Re was found in the vehicle with a gaping shotgun wound to his side. He was bleeding heavily and having trouble breathing, but he was conscious and in extreme pain. Re said "[h]e shot me." Upon inquiry, Re said that a "crazy" Mexican man "on drugs," whom he did not know, had shot him with a shotgun. Re described the man as having straight, brown, medium-length hair and a mark under his eye. Re told a police officer that the man who had shot him had also robbed him. Re stated that he knew he was going to die and "wanted to die" and repeatedly urged a police officer to "shoot him, to put him out of his pain and misery." Re, who was 54 years old, died a few hours later at the hospital.

The police found an athletic bag inside Re's car. The bag contained a black jacket and a sawed-off shotgun with a pistol grip. A blackened hole in one end of the bag showed that the shotgun had been fired while inside the bag. A slit in the bag would have permitted a person to put a hand inside the bag and fire the shotgun without opening the bag.

On August 13, shortly after noon, Honesto ran into an acquaintance on the bus. Honesto asked his acquaintance if he had "heard about a shooting on 101." The acquaintance said no. Honesto then said that the victim of the shooting had "threatened to kill his brother." Honesto claimed that he had told his brother "Why let him kill you? Let's kill him first." When his brother declined, Honesto offered to kill the man. Honesto described how he had kidnapped the man at his home and forced him into his car. Then there was an "accident," and the man was shot and killed. Shortly after the murder, Honesto telephoned his other brother, who was attending the police academy, and asked him about fingerprints.

Honesto's statements to the acquaintance resulted in Honesto's arrest. He was charged by information with murder (Pen. Code, § 187), attempted robbery (Pen. Code, §§ 211, 664), kidnapping (Pen. Code, § 207, subd. (a)) and kidnapping for robbery (Pen. Code, § 209, subd. (b)). It was further alleged that he had personally used a firearm in the commission of these offenses (Pen. Code, § 12022.5). The information also alleged as special

---

[2] The driver of this car was initially trapped in the vehicle but was eventually able to crawl out. He was not injured.

circumstances that the murder had been committed in the course of the attempted robbery and kidnapping.

The charges were tried before a jury, but the jury deadlocked. A couple of hours after the jury reported its deadlock, Honesto entered into a plea agreement under which he pleaded no contest to second degree murder and admitted the personal use allegation in exchange for dismissal of the remaining counts and the special circumstance allegations.

Honesto told the probation officer that he was "stating he is guilty of the offense in order to impress the parole board, who will be setting his release date in a few years." Honesto was committed to state prison for the prescribed term of 17 years to life. At the sentencing hearing, the trial court expressed the opinion that "Mr. Honesto factually is guilty of first degree murder" and noted that it had "a very serious doubt that he is ever going to be rehabilitated."

## II. Time in Jail and Prison

While in jail pending trial and sentencing in 1984 through 1987, Honesto committed 15 infractions of jail rules. These infractions included possessing pruno,[3] making a cuff key, mooning a correctional officer, kicking a correctional officer and "agitating" other inmates.

In January 1988, Honesto was disciplined in prison for fighting with another inmate. In March 1994, Honesto was disciplined for behavioral misconduct. He has not had any further disciplinary problems in prison.

In 1989, Honesto obtained his GED, and in 1992 and 1993 he completed an AA degree and a vocational program in data processing. From 1987 to 1997, Honesto participated in AA and NA, and he also completed an eight-week substance abuse program. Honesto has not participated in NA or AA since 1997.

During a 1990 psychiatric evaluation and a 1994 psychological evaluation, Honesto claimed that the shooting was accidental. He asserted that the shotgun "went off" during a struggle between himself and Re for the bag containing the gun. He blamed peer pressure and his alcohol intoxication for Re's death. A 1994 life prisoner evaluation in preparation for his initial parole hearing noted that Honesto's "degree of threat to the public safety appears unpredictable and dependent upon his willingness to abstain from substance abuse upon parole." In 1990 and 1994, Honesto's family wrote to the Board

---

[3] Pruno is inmate-produced alcohol.

offering support for Honesto upon his parole including financial support and employment. In a June 2000 mental health evaluation report, Honesto stated that he intended to remain sober, but he "did not mention any specific plan or treatment to do so." The life prisoner evaluation prepared for the 2001 parole hearing noted that Honesto stated that upon parole he would live with his parents and work for their catering business.

## III. Parole Hearings

Honesto was first eligible for parole in 1995. His initial parole hearing was held in December 1994. At that hearing, Honesto claimed that there had been a prior "disagreement" between Re and "a relative" of his. He asserted that, after the car came to a stop, he tried to get out, but the door was jammed. Re then grabbed the bag containing the gun. They struggled for control of the bag and "the gun went off through the bag and shot him in the side." Honesto said that his hand was on the outside of the bag and that he did not "intentionally pull the trigger." Honesto continued to try to get out of the passenger's side, but he failed. He then climbed over Re, squeezed out of the driver's side window and ran away. He blamed "drinking" for all of his misconduct and for "ma[king] me take a human life." Honesto told the Board that he would continue going to AA "for the rest of my life . . . ."

The Board denied parole for two years. It found that: (1) the offense "was carried out in an especially cruel and callous manner with the disregard for the life and suffering of another and a dispassionate and calculated manner;" (2) Honesto had "an escalating pattern of criminal conduct that includes numerous prior arrests;" and (3) he had not "sufficiently participated" in self-help and therapy programming.

At his second parole hearing in February 1997, Honesto admitted that his shooting of Re "wasn't an accident" and that he "had the gun in my hand." He claimed that he shot Re after the vehicle came to rest. Honesto asserted that he had tried to exit the car through the passenger's side door, but it would not open. Then, he claimed, during a struggle between the two men for control of the gun, he grasped the trigger and the gun was fired. Honesto told the Board at the 1997 hearing that he had no parole plans because "I belong in prison . . . for what I did . . . ." "I agree with the district attorney. I deserve a multiple-year denial for what I've done. . . . [S]o treat me like a first degree and not like a second degree because I'm guilty of what I did regardless of what took place, and I should be punished for that."

The Board agreed and denied him parole for three years based on his "cruel and callous" offense, his prior history of "an escalating pattern of criminal conduct," his failure in "previous attempts to correct his criminality," his long history of arrests, his misbehavior in jail, his failure to participate in "sufficient beneficial self-help and therapy" including AA and NA, and inadequate parole plans.

Honesto appeared at the commencement of his third parole hearing in January 2001, but he waived his right to counsel and chose "not to participate" in the hearing. There were no new letters of support submitted on his behalf, and "nothing at all from his parents indicating that he can in fact live with them or that they do own this catering company."[4] A Santa Clara County deputy district attorney spoke at the hearing in opposition to Honesto's parole. He believed that Honesto's criminal record of arrests and convictions, his "drinking problem" and "judgment problem" and the nature of the offense and Honesto's lies about it showed that Honesto was not suitable for parole. Re's daughter and brother spoke in opposition to parole based on Honesto's "horrible crime."

The Board denied Honesto parole for two years. It found that he was unsuitable for parole because he would pose an unreasonable risk of danger to society or a threat to public safety if released. The Board based its decision on "[m]any factors": (1) the offense "was carried out in a cruel manner, a manner which demonstrates a callous disregard for human suffering . . . [and which was] carried out in a vicious . . . manner," (2) "the motive for this crime was very trivial in relation to the offense," (3) his "unstable social history" including numerous arrests and alcohol abuse, (4) insufficient participation in prison in self-help and therapy, and (5) no documentation of lodging or employment offers in support of his parole plans.

## IV. Honesto's Petition For a Writ of Habeas Corpus

In September 2002, Honesto filed a petition in Santa Clara County Superior Court alleging that he had wrongfully been denied parole in January 2001. Honesto asserted that (1) his punishment was disproportionate to his culpability, (2) the Governor's "no-parole policy" violated the separation of powers, (3) the Governor's "no parole policy" had retroactively altered his plea agreement by making parole unavailable and (4) his plea had been involuntary. In October 2002, the court denied his petition "without prejudice to the filing of supplemental exhibits" because Honesto had failed to submit adequate documentation including a transcript of the entire hearing before the Board.

---

[4] In November 2002, long after the January 2001 hearing, Honesto's family members sent letters to the Board in support of Honesto's parole. These letters offered housing, financial support and employment.

In January 2003, Honesto submitted supplemental exhibits in support of his petition, and the court issued an order to show cause. The court found that Honesto had stated a prima facie case on (1) the "no-parole policy" issue, (2) whether some evidence supported the Board's decision and (3) whether his plea agreement had been violated.

In March 2003, the Board filed a return. It took the position that the "no-parole policy" issue had been resolved in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174], that the Board's decision was supported by some evidence and that Honesto's allegation of a plea bargain violation was untimely.

In November 2003, Honesto filed a "denial." He contended that (1) *Rosenkrantz* had not resolved the no-parole policy issue, (2) the Board's decision was not supported by any evidence and (3) he had been denied the benefit of his plea bargain by the Board's no-parole policy. Honesto urged the court to either order the Board to grant him parole or to allow him to withdraw his plea.

The court issued "interim order[s]" in which it interpreted Honesto's plea bargain violation claim as asserting that "it was understood [as part of the plea] that if he performed and programmed well in prison the Board would set his term as indicated by its matrix." The court noted that Honesto supported this claim with a declaration that his "Trial Counsel" had given him such advice about the proposed plea bargain. The court requested supplemental briefing and evidence on the plea bargain issue. It noted that Honesto "has already served more time than any matrix designation for second degree murder." The court acknowledged that there was "some evidence" that Honesto's crime "was first degree murder," but it concluded that due process prohibited the Board from considering that fact due to the plea agreement specifying that the offense was second degree murder.

The Board responded that there was no evidence that Honesto had been "promised—within the context of the plea agreement itself—that he would be paroled at any specific time." It also argued that the Board could not be bound by the district attorney's promises in the plea agreement.

In April 2004, the court issued an order granting Honesto's petition and remanding the matter to the Board for a new hearing. The court found that the "recharacterization" of Honesto's offense as first degree murder by the Board violated due process and required reversal of its decision. It rejected the notion that the Board could deny parole on the basis that Honesto's offense was "a particularly egregious example of second degree murder." The court concluded that "[w]hen there is a plea bargain, the Board's discretionary use of the crime is limited to the statutory matrix." "When, as in this

case, the only basis for the Board's jurisdiction over the inmate is his plea bargain, the inmate's liberty interest/due process rights translate into a vested right that the facts of the crime can not be reexamined and recharacterized as calling for more punishment than the second degree matrix." The court reasoned that any other conclusion would deny Honesto the sole benefit of his plea bargain.

The court also concluded that the Board's findings concerning Honesto's "unstable social history," prior criminal record, inadequate self-help and therapy programming and inadequate parole plans were not valid reasons to deny parole. The court remanded the matter to the Board for a new hearing at which the Board was "precluded from relying" on any of those reasons.

The Board filed a timely notice of appeal and sought a writ of supersedeas in this court. We issued a writ of supersedeas staying the superior court's order pending resolution of the appeal. The appeal was expedited and granted calendar preference.

## V. Discussion

On appeal, the Board asserts that the superior court erred in concluding that the Board violated Honesto's plea agreement by considering the facts of the offense in determining whether Honesto was suitable for parole. The Board maintains that its decision must be upheld because it was supported by some evidence.

## A. No Violation of Plea Agreement

The superior court concluded that, "[w]hen there is a plea bargain, the Board's discretionary use of the crime is limited to the statutory matrix" and "the inmate's liberty interest/due process rights translate into a vested right that the facts of the crime can not be reexamined and recharacterized as calling for more punishment than the second degree matrix" because otherwise the inmate would be denied the sole benefit of his plea bargain.

The Board challenges the superior court's theory. It argues that the Board was required by statute to evaluate all of the facts of the offense in assessing Honesto's suitability for parole and that there was no violation of Honesto's plea agreement since the agreed punishment was 17 years *to life*, which has not been exceeded, and no other express or implied promises were made to Honesto to induce his plea.

Honesto claims that the Board's denial of parole violated his plea agreement because an element of his plea agreement, and his sole motivation for

pleading no contest, was that he would have the "right to parole" "in accord with the second-degree murder matrix" and that the matrix would "take precedence over the Board's standard procedure for determining parole suitability." Honesto asserts that, because the matrix was the basis for his plea agreement, the Board could not properly consider the facts of his offense as a basis for finding him unsuitable for parole. As he has "served his full sentence" under the agreement, Honesto asserts that "the only acceptable remedy" for the plea agreement violation is his "release from prison."

■ The evidentiary premise for Honesto's plea agreement violation claim is absent. The terms of a plea agreement must be placed on the record. (*People v. West* (1970) 3 Cal.3d 595, 611 [91 Cal.Rptr. 385, 477 P.2d 409].) The record before the superior court does not include a transcript of Honesto's entry of his plea. The only record of his plea is the clerk's minutes. While we can readily infer from the minutes that the plea was entered pursuant to an agreement, there is no evidence that this plea agreement involved anything other than the exchange of the no contest plea and admission for dismissal of the other counts and the special circumstance allegations. Honesto chooses to rely on his own subjective understanding of the potential benefits of the agreement and the alleged advice given him by his trial counsel at the time of the plea. He did not submit a transcript or a declaration from the trial judge, his trial counsel or the prosecutor.

■ A plea agreement violation claim depends upon the actual terms of the agreement, not the subjective understanding of the defendant or deficient advice provided by his attorney. The superior court could not properly find that there was a violation of a term of the plea agreement involving parole eligibility in the absence of evidence of a promise or representation regarding parole eligibility at the time of the plea. No such promise or representation may be inferred from the record here. ■ When Honesto entered his plea, the law provided, as it does now, that the Board could find a prisoner unsuitable for parole based on the nature of the offense. (*Morris v. Castro* (1985) 166 Cal.App.3d 33, 39 [212 Cal.Rptr. 299] and fn. 3; Pen. Code, § 3041, subd. (b); Cal. Code Regs., tit. 15,[5] § 2402, subd. (c)(1).)

■ The fact that Honesto agreed to a bargain that subjected him to a life sentence rebuts his claim that his bargain granted him a "right to parole" as soon as he reached a certain point on the "matrix." No evidence exists that such a promise was made to him, and the relevant statutes and regulations that govern parole clearly do not entitle a prisoner to release on parole, regardless of the amount of time served, unless the prisoner is found suitable

---

[5] We will reference this title of the Code of Regulations as Regulations in the remainder of this opinion.

for parole. (Pen. Code, § 3041, subd. (b); Regs, § 2402; *See In re Dannenberg* (2005) 34 Cal.4th 1061, 1079–1080, 1095 [23 Cal.Rptr.3d 417, 104 P.3d 783].)

 "The [Board] shall *first determine* whether the life prisoner is *suitable* for release on parole. *Regardless of the length of time served*, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board] the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs, § 2402, subd. (a), italics added.) "The length of time a prisoner must serve prior to actual release on parole is determined by the board." (Regs, § 2400.) Only after a prisoner is found suitable for parole will the Board consider the appropriate length of the prisoner's term and set a parole date. (Regs, § 2401.) The matrices set forth in the regulations "are guidelines only," and the Board may set a term that is shorter or longer than suggested by these guidelines. (Regs, § 2401.)

Under these regulations, Honesto was not entitled to parole until he was both found suitable for parole and had served a term found to be appropriate by the Board, and this term could exceed the maximum term set forth in the second degree murder matrix. The fact that this has not yet occurred does not violate any aspect of the plea agreement evidenced by this record. We disagree with the superior court's conclusion (and Honesto's argument) that the sole benefit of his plea agreement was early parole eligibility. Honesto was facing the *death penalty* or life *without parole* for a special circumstances murder plus attempted robbery and kidnapping counts when he entered into the plea agreement. His bargain *spared his life.* This significant benefit belies his claim that the sole benefit of his bargain was understood to be parole under the second degree murder matrix.

We also reject the superior court's conclusion that the Board violated Honesto's plea agreement by denying him parole based on the facts of his offense. The applicable statute and regulations make the facts of the offense a critical part of the Board's consideration of parole suitability, and this was true when Honesto entered into the plea agreement. (Pen. Code, § 3041, subd. (b); Regs, § 2402, subd. (c)(1); see In re Dannenberg, supra, 34 Cal.4th at p. 1082.) Honesto has not established that any express or implied term of his plea agreement precluded the Board from exercising its statutorily authorized discretion to consider the facts of the offense in determining his suitability for parole.

### B. The Board's Decision Is Supported by Some Evidence

The superior court's order does not explicitly find that the Board's decision is not supported by some evidence, but it calls the Board's decision into

question by invalidating many of the reasons that the Board gave for its decision. Therefore, it is appropriate for us to consider, as the parties urge us, whether some evidence supports the Board's decision to deny parole.

### 1. Standard of Review

■ "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

■ "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an *individualized consideration of the specified criteria* and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board]'s decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board]'s decision." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677, italics added.)

Judicial review of the Board's decision is therefore highly deferential, but our review of the superior court's decision is independent because the superior court based its order solely upon documentary evidence. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

### 2. Parole Suitability Considerations

The Board's regulations set forth very specific considerations that the Board must take into account in determining whether a prisoner is suitable for parole or unsuitable for parole.

"[A] life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board] the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs, § 2402, subd. (a).) Six circumstances are specified in the regulation as showing unsuitability, but only three of those circumstances are potentially relevant here: (1) "The prisoner committed the offense in an especially heinous, atrocious or cruel manner," (2) "The prisoner has a history of unstable or tumultuous relationships with others;" and (3) "The prisoner has engaged in serious misconduct in prison or jail." (Regs, § 2402, subd. (c).) As to the first circumstance, the regulations specify that an offense is "especially heinous" if it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" or "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (Regs, § 2402, subd. (c)(1).)

The circumstances "tending to show suitability" set forth in the Board's regulations are: no juvenile record (Regs, § 2402, subd. (d)(1)); stable social history (Regs, § 2402, subd. (d)(2)); remorse (Regs, § 2402, subd. (d)(3)); the crime was "the result of significant stress" in the prisoner's life (Regs, § 2402, subd. (d)(4)); "the prisoner suffered from Battered Woman Syndrome" (Regs, § 2402, subd. (d)(5)); lack of criminal history (Regs, § 2402, subd. (d)(6)); "[t]he prisoner's present age reduces the probability of recidivism" (Regs, § 2402, subd. (d)(7)); "[t]he prisoner has made realistic plans for release" (Regs, § 2402, subd. (d)(8)); and "[i]nstitutional activities indicate an enhanced ability to function within the law upon release" (Regs, § 2402, subd. (d)(9)).

### 3. Analysis

Here, the Board found that the offense "was carried out in a cruel manner . . . which demonstrates a callous disregard for human suffering" and "the motive for this crime was very trivial in relation to the offense." Honesto kidnapped Re, a man he did not know, for the sole purpose of robbing a grocery store. His motivation was to obtain money, and Re had been selected as the victim based on a trivial perceived slight to Honesto's brother. Honesto knew that he might need to murder Re, yet he willingly engaged in the kidnapping and robbery.

Some evidence suggests that the shotgun blast precipitated the car accident rather than coming after the accident as Honesto claims. Thus, the Board could have found that, while Re was driving down Highway 101 at night, Honesto fired his concealed shotgun into Re at point-blank range, causing a multiple-vehicle accident that endangered the safety of numerous other

motorists. And after Re's car came to a stop, Honesto climbed over the mortally wounded Re and ran away, leaving a conscious Re to suffer a prolonged and painful death.

■ "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations.] Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant." (*In re Rosenkrantz, supra*, 29 Cal.4th at pp. 682–683; *In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

■ "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . .' (Pen. Code, § 3041, subd. (a).) 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be *particularly egregious* to justify the denial of a parole date.' [Citation.]" (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 683, italics added; see *In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

The Board could have legitimately concluded that Honesto's killing of Re was "more aggravated or violent than the minimum necessary to sustain a conviction for" second degree murder. Indeed, Honesto's killing of Re in the midst of traffic as Re complied with his demands was far more egregious than the minimum necessary to justify a second degree murder conviction. The killing of Re had been contemplated in advance, the manner of killing was cruelly prolonged, the motive was trivial and the circumstances of the killing resulted in predictably serious danger to other motorists.

The Board also found that Honesto had an "unstable social history" involving numerous arrests and alcohol abuse. While, as Honesto points out, the *un*suitability criteria refer only to "a history of unstable or tumultuous relationships with others," the *suitability* criteria direct the Board to consider whether the prisoner has a criminal history or a stable social history. (Regs, § 2402, subd. (d)(1), (2), (6).) Both the suitability and unsuitability criteria are obviously relevant to a prisoner's suitability for parole. At the tender age of 21, Honesto had already accumulated 21 misdemeanor convictions, had been arrested many additional times and had failed on probation. He had not completed high school and was unemployed. His alcohol abuse had obviously contributed to his instability. This factor is supported by some evidence.

The Board found that Honesto had not participated in adequate programs in prison to reform himself. One of the criteria for suitability is that "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs, § 2402, subd. (d)(9).) Honesto had participated in AA and NA until 1997, but, by the time of the 2001 parole hearing, it had been more than three years since his last participation in these programs. In light of the fact that Honesto blamed his offense on his alcohol abuse and yet had continued to abuse alcohol even while he was in jail pending trial, the Board had good reason to be concerned about Honesto's termination of his participation in any alcohol abuse treatment program. His failure to continue to pursue alcohol abuse treatment tended to indicate that he could not be counted upon to maintain his sobriety upon his release. This factor is supported by some evidence.

Finally, the Board found that the lack of current documentation of lodging or employment offers in support of his parole plans reflected that Honesto was not yet suitable for parole. A suitability consideration is whether "[t]he prisoner has made realistic plans for release." (Regs, § 2402, subd. (d)(8).) Honesto presented no current documentation to the Board at the 2001 hearing that supported his parole plans. His family members had, years earlier, submitted supportive letters, but the Board could have doubted whether those dated offers of financial support, employment and housing from his parents and siblings remained valid. Some evidence supports the Board's conclusion that Honesto had failed to show that his parole plan to be supported and housed by his family remained realistic.

All of the Board's reasons for deeming Honesto unsuitable for parole are supported by some evidence. Therefore, the Board's decision to deny him parole must be upheld.

## VI. Disposition

The superior court's order granting Honesto's petition is reversed, and the matter is remanded to the superior court with directions to enter a new order denying Honesto's petition.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 12, 2005.