Filed 4/12/16  In re Martin CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re MICHAEL MARTIN,<br><br>    on Habeas Corpus. | E062292<br><br>(Super.Ct.No. RIC1401422)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Richard Todd Fields, Judge.  Reversed.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Senior Assistant Attorney General, Phillip J. Lindsay and Linnea D. Piazza, Deputy Attorneys General, for Appellant.

Rich Pfeiffer, under appointment by the Court of Appeal, for Respondent.

1

## INTRODUCTION

The People appeal from an order of the trial court reversing the Governor's decision that Michael Martin poses a current unreasonable risk of danger to the public and is unsuitable for release on parole. We conclude that sufficient evidence in the record supports the Governor's decision in that Martin has minimized his involvement in the underlying crimes, he lacks insight into his commitment offenses and criminal history, and he has failed to participate in and complete sufficient substance abuse programs in prison. We therefore reverse the trial court's order.

## PROCEDURAL HISTORY

Based on a crime spree during the summer of 1977, Martin was convicted in 1978 of first degree murder (Pen. Code, § 187),[1] robbery (§ 211), and attempted second degree murder (§§ 664, 187), with true findings that he was armed with a firearm as to all counts (§ 12022, subd. (a)) and that he used a firearm in four of the counts (§ 12022.5). An additional charge of burglary (§ 459) was dismissed. Martin was sentenced to 12 years to life in state prison.

On December 18, 2012, a parole suitability hearing was held in which the Board of Parole Hearings (the Board) found Martin suitable for parole based on his age (then 53 years old), remorse and acceptance of responsibility, positive staff reports, cognitive limitations, lack of institutional misconduct for the past 13 years, recent self-help programming, and realistic parole plans.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The Governor reversed the Board's decision to grant Martin parole. The Governor found that Martin had "participated in very few self-help programs in nearly 36 years of incarceration and has not completed any substance abuse classes since 2009," even though Martin conceded that his "drug addiction fueled his violent criminal behavior." The Governor also found that Martin continued to minimize the severity of his crimes and did not sufficiently "accept or even appreciate" his actions.

Martin filed a petition for writ of habeas corpus in the Riverside County Superior Court challenging the Governor's reversal. The superior court granted the petition and reinstated the Board's grant of parole. This appeal ensued.

FACTUAL BACKGROUND

We set forth the facts consistent with the standard that governs our review of the Governor's decision: Whether "some evidence" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 679) or "a modicum of evidence" (*In re Shaputis* (2011) 53 Cal.4th 192, 214) supports that decision.

**Martin's Commitment Offenses**

In the early morning hours of August 18, 1977, Martin and his accomplice, Michael Atkinson, held up at gunpoint Hugh Frazer, his wife, and his 16-year-old daughter after striking the Frazers' car from behind in a stolen vehicle. After robbing the Frazers, Martin fired a shot into the Frazers' car, hitting the headrest an inch from Hugh's head.

On the morning of August 21, 1977, Martin and his accomplice, David Benard, pulled their car off the road. Benard stood near the open hood of the car, pretending to be

3

stranded, while Martin hid in the bushes. Victor Sam, a correctional officer for the California Department of Corrections, stopped to offer aid. Benard held Sam up with a shotgun. While searching Sam's wallet, he found Sam's correctional officer identification. Benard told Martin that Sam was one of "the guys who used to F with [his] head . . . in prison." Benard gave Martin Sam's watch and told him to take the watch and Sam's car and leave, which Martin did. Martin did not think Sam was going to be killed, and he did not remember Benard saying that Sam would have to die. After Martin left, Benard marched Sam up a hill at gunpoint, ordered him to lie down, and shot him in the back of the head. Martin told the Board he had not seen Benard again, and he did not know Sam was dead until he was arrested in Sam's car a few days later.

**Martin's Other Crimes**

Martin admitted to the Board that he and a partner had gone out eight to 10 times pretending they needed help or ramming into victims' cars and then committing robberies. The crimes that are documented in the record are set forth below.

On the night of June 29, 1977, Martin and Benard pretended to be having car trouble and flagged down Dean Leonard, who pulled over and offered them a ride. Benard pointed a gun at Leonard. As Leonard sped away, a bullet struck his rear window and shattered it. Martin contends that the record does not establish that he participated in the robbery of Leonard. However, the probation officer's report states that Martin "appears to have been standing near the suspect vehicle when the offense took place."

On August 5, 1977, Martin and Benard drove their car into the back of the car Thomas McCoy was driving. Both Martin and Benard brandished firearms and robbed

4

McCoy and his three passengers of their personal belongings and ordered everyone to get out. Martin and Benard then drove off in McCoy's car.

On August 18, 1977, Martin and Atkinson struck Edward Coughlin's vehicle from behind. When Coughlin pulled over, Martin and Atkinson drove alongside Coughlin's car and fired into it, shattering a window. The bullet entered Coughlin's seat and lodged within an inch or two of his back, and Coughlin was injured by the breaking glass. On Martin and Atkinson's orders, Coughlin got out of his car and surrendered his wallet and keys. Martin and Atkinson shouted for him to run, and when he did so, shots were fired at him.

On August 21, 1977, only hours before the murder of Sam, Clara Fullwood heard her doorbell ring. She went to the door and saw a man matching Martin's description holding a shotgun. He said, "Move and you're dead." Moments later, he fired. The close range shot blew off the lower part of Fullwood's face from the middle of her nose to the bottom of her throat, although Fullwood survived. Martin told the Board that he had been present when Fullwood was shot, but Benard had fired the shot through a glass door. Martin stated he did not know she had been hit. He also said he had been standing at the bottom of the stairs.

**Martin's Substance Abuse History**

Martin began using alcohol at age 13 and drank whiskey daily by age 15. He started using marijuana at the age of 10 or 11 and used it daily by age 13. He began using cocaine and heroin at age 15. Before his crime spree, he stated he had been using marijuana and phencyclidine (PCP) daily. Martin admitted that he was addicted to PCP and was high on

5

PCP during his crimes. He told the Board he would not have made the same choices if he had not been using PCP. He admitted he committed many of the robberies to obtain money to buy more drugs.

Martin continued to use marijuana in prison. He received three rule violation reports for possession of marijuana; the last report was in 1993. In 2000, he received a rule violation report after refusing to submit to a urinalysis test when marijuana was found in his cell. (He claimed the marijuana belonged to his cellmate.) Martin first told the Board he last used drugs in the "[e]arly part of the '80s," but later stated he had last used drugs in 1993.

The record does not indicate that Martin participated in any substance abuse programs in prison from 1979 through 1990. In 1991, he completed two 120-hour substance abuse programs. No participation was shown from 1992 through 1994. In November 1995, he participated in a 20-hour program. Almost a year later, he began attending Narcotics Anonymous (NA) meetings. He attended four out of five meetings in the fourth quarter of 1996 and three out of five meetings in the first quarter of 1997. He then did not participate in any substance abuse programs until 2006, when he attended one Alcoholics Anonymous (AA) meeting and one NA meeting. In 2007 and 2008, he attended one AA meeting and one NA meeting each year. In 2009, he attended several AA and NA meetings and then stopped participating until 2012. He attended one AA meeting in July 2012, one AA meeting and one NA meeting in September 2012, and one AA meeting in October 2012.

Martin told the Board that NA classes were no longer offered at the prison, but he did participate in "yard groups" with former NA attendees and attended weekly AA meetings. Martin denied that he had a problem with drugs.

**Martin's Comprehensive Psychological Risk Assessment**

Rushton A. Backer, Ph.D., a forensic psychologist, conducted a comprehensive psychological risk assessment of Martin in March 2010. Dr. Becker stated his opinion that Martin "appeared to have gained some accurate insight into his behaviors that led to his life crime(s)," but his "insight remain[ed] limited." Dr. Becker diagnosed Martin with polysubstance dependence in a controlled environment and with antisocial personality disorder, which is characterized by "a pattern of disregard for, and violation of the rights of others, beginning in adolescence and continuing into adulthood." Although Martin's behaviors had improved in the last 15 years, he had limited insight into the effect of his personality disorder on his thoughts and behaviors. Dr. Becker found Martin's remorse and insight into his crimes "developing but incomplete." Dr. Becker agreed with Martin's assessment that his drug addiction, desire to obtain money to buy drugs, lack of morals and care for life, and being easily influenced by his crime partners were contributing factors to his crimes. Dr. Becker opined that Martin had a "moderate level of insight."

Dr. Becker assessed Martin's score for violent recidivism as being in the moderate range and his score for general risk of recidivism as being in the moderate/high range because of his pattern of antisocial behavior and his diagnosis of antisocial personality disorder. In addition, Martin's "sporadic" participation in alcohol and substance abuse

programs and his underestimation of the severity of his past substance abuse and risk for relapse elevated Martin's risk of dangerous behavior and violent recidivism. Dr. Becker viewed Martin's risk of relapse as high unless Martin made a commitment to participate in AA or NA or similar programs in the community. In Dr. Becker's opinion, Martin's risk of violent recidivism would increase if he used substances, even recreationally, but would decrease if he participated actively in sobriety programs.

Dr. Becker's report stated that Martin had used marijuana laced with PCP before and during the commission of his crimes, and "had severe substance abuse/dependency in the community, which affected all areas of his life and significantly contributed to his behaviors leading up to his life crime(s)." Martin stated he did not have a problem with drugs and had not used drugs for nearly 30 years; however, his file indicated he had not used drugs for about 10 years, and his abstinence had "occurred in a highly structured environment." Dr. Becker noted that Martin's "participation in AA/NA has been sporadic by his own admission. He appears to underestimate the severity of his past substance use and his risk for relapse once released."

Dr. Becker stated in his report that Martin's "use of drugs appears to have been a major motivation for his participation in his life crime and likely impaired his judgment. Although he reportedly has been sober for the past ten years, he appears to underestimate his relapse potential. Unless he makes a commitment to actively participate in AA/NA or similar programs in the community, his risk for relapse is viewed as high."

Additional facts are set forth in the discussion of the issues to which they pertain.

8

DISCUSSION

**Standard of Review**

In reviewing the Board's decision to release a prisoner on parole, the Governor must determine whether the prisoner would pose a current danger to the public if released. "[A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision deny parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1214.)

In turn, our review of a gubernatorial parole denial is "extremely deferential." (*In re Rosenkrantz*, *supra*, 29 Cal.4th at p. 679.) Because the superior court based its decision solely on documentary evidence, we review the superior court's decision de novo. (*Id.* at p. 677.) We determine solely whether "some evidence" supports the conclusion that the inmate is unsuitable for parole because he remains a current threat to public safety. (*Id.* at p. 679.) We uphold the Governor's executive decision "unless it is arbitrary or procedurally flawed." (*In re Shaputis*, *supra*, 53 Cal.4th at p. 221.) We "consider the whole record in the light most favorable to the determination before [us], to determine whether it discloses some evidence—a modicum of evidence—supporting the

9

determination that the inmate would pose a danger to the public if released on parole."
(*Id.* at p. 214.)

**Evidence Supporting the Governor's Determination That Martin Minimized His Crimes and Lacks Insight into His Commitment Offenses and Criminal History**

*The Governor's Determination*

The Governor found that Martin continued to minimize the severity of his crimes and did not sufficiently "accept or even appreciate" his actions. The Governor pointed out that even though Martin had fired his gun at several robbery victims and had nearly killed Frazer, Martin claimed at the Board hearing that he "'just shot the gun . . . to scare somebody' and 'didn't know that it actually hit somebody' until after his arrest. He indicated that they never intended to hurt or kill anyone in the course of the robberies. He stated that he left before Mr. Benard murdered Officer Sam and didn't know that Officer Sam would be harmed." The Governor found that Martin's statements "strain[ed] credulity" and "lack[ed] all credibility." The Governor concluded, "Until Mr. Martin can come to terms with his actions, and better explain what led him to become so violent and indifferent to human life, I am not prepared to release him."

*The Evidence in the Record Supports the Governor's Determination*

Dr. Becker's report alone provides evidence to support the Governor's determination. Dr. Becker described Martin's insight and self assessment as "developing but incomplete." While his insight was improving, it "remain[ed] limited." Dr. Becker also concluded that Martin's "level of remorse and insight into his life crime(s)" was similarly "developing but incomplete" although his remorse and insight were increasing.

10

The report stated that Martin appeared not to understand that his crimes "reflected features of his Antisocial Personality Disorder," and "it appears that he may still be minimizing some of his behaviors during the commission of these crimes."[2]

In addition, Martin's own statements about his offenses and the Governor's assessment of the credibility of those statements provide further support for the Governor's determination. In describing the Sam incident to the Board, Martin stated that he did not think violence was going to happen because he and Benard "had never killed nobody or shot nobody that [he] had knowledge of," but that he had just shot the gun to scare people. When one of the commissioners pointed out that Martin had fired a shot that hit the headrest of a car a person was sitting in, Martin stated he did not know he had hit anyone until later. Martin likewise stated he did not know that Benard had shot Fullwood in the face only hours before the Sam incident.

Martin told the Board that he did not remember hearing Benard say that Sam needed to die after Benard found Sam's correctional officer identification card. However, at Martin's trial, witness Michael Miller testified that Martin gave Miller a watch to wear and said four or five times, you are wearing "a dead man's watch." At the same time, Martin said three or four times that his partner had shot "a guy" and left him

---

[2] Martin argues that Dr. Becker's report, prepared more than two years before the hearing, was out of date. However, nothing in the record suggests that Martin's circumstances with respect to the Governor's concerns had significantly changed in the interim. Martin's participation in substance abuse programs continued to be sporadic, and he stated at the hearing that he still did not have an AA or NA sponsor. His statements to the Board about his offenses were largely consistent with his statements to Dr. Becker about those offenses.

in the mountains. Another witness, Jerry Hill, who had been in jail with Martin, testified that Martin told him that Benard took the driver away into the hills while Martin searched the driver's car. Benard "came down by himself and told him that he had shot the guy and did he want to go see it." Martin said he had not known the guy was going to be killed. Martin told Hill that he knew the guy was a police officer because of some papers found in Hill's vehicle. Michael Atkinson, an accomplice in the Frazer and Coughlin crimes, testified that Martin told him that after Benard found Sam's correctional officer identification, while going through Sam's wallet, Benard told Martin to go down the hill and that he, Benard, was going to kill Sam.

The Governor was free to make his own credibility determinations, and we defer to those determinations. (*In re Shaputis*, *supra*, 53 Cal.4th at p. 214.) In light of the whole record, we conclude that much more than a modicum of evidence supports the Governor's determination that Martin would pose a current danger to the public if released in light of his minimization of and lack of insight into his commitment offenses. (*Ibid*.)

**Evidence Supporting the Governor's Determination That Martin Failed to Participate in Self-Help Programs**

The Governor found that Martin had "participated in very few self-help programs in nearly 36 years of incarceration, and has not completed any substance abuse classes since 2009," even though Martin conceded that his "drug addiction fueled his violent criminal behavior." The Governor found that lack of participation "concerning" because Martin acknowledged that his drug addiction fueled his criminal behavior.

12

In *In re Honesto* (2005) 130 Cal.App.4th 81, the court upheld a decision to deny parole based on a finding that the defendant "had not participated in adequate programs in prison to reform himself." (*Id*. at p. 97.) Although the defendant had earlier attended AA and NA meetings, he had not done so for more than three years before the parole hearing. The court noted that because the defendant "blamed his offense on his alcohol abuse and yet had continued to abuse alcohol even while he was in jail pending trial, the Board had good reason to be concerned about [the defendant's] termination of his participation in any alcohol abuse treatment program. His failure to continue to pursue alcohol abuse treatment tended to indicate that he could not be counted upon to maintain his sobriety upon his release." (*Ibid*.)

Despite Martin's concession that his drug use led to his criminal acts, the record before this court shows that for approximately 29 of his 36 years of incarceration, he had not participated in any substance or alcohol abuse programs, and his attendance at NA and AA meetings had been sporadic even in the years before the Board hearing. As of his hearing in 2012, Martin had not completed all 12 steps of an AA or NA program, and he had no official AA or NA sponsor. Additionally, Dr. Becker stated his opinion that Martin "appear[ed] to underestimate the severity of his past substance abuse and his risk for relapse once released." As in *People v. Honesto*, *supra*, 130 Cal.App.4th 81, evidence in this record amply supports the Governor's finding that Martin is unsuitable for parole in that he poses a risk of danger to the community because he has failed to fully participate and complete programs that would address his substance abuse problems.

DISPOSITION

The order granting Martin's petition is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER  
        J.

We concur:

RAMIREZ  
      P. J.

MILLER  
      J.

14