Filed 6/1/23  P. v. Valle CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> HECTOR RUBEN VALLE, <br><br> Defendant and Appellant. | F083418 <br><br> (Super. Ct. No. BF137858B) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

In 2013, a jury convicted defendant Hector Ruben Valle of second degree murder of Cipriano Maldonado (Pen. Code, § 187; count 1), assault with a deadly weapon of

A.Z. (§ 245, subd. (a)(1); count 2), and participation in a criminal street gang (§ 186.22, subd. (a); count 3) and found true gang enhancements alleged as to counts 1 and 2 (§ 186.22, subd. (b)(1)) based on his participation in a gang fight during which Maldonado was stabbed and killed. (Undesignated statutory references are to the Penal Code.) The jury could not reach a verdict on the allegation defendant personally used a knife during the commission of the murder or on the allegation that he personally inflicted great bodily injury upon A.Z., and the court dismissed those allegations. Codefendant Saul Gonzalez was acquitted on all three counts.

In 2019, defendant filed a petition for resentencing in light of the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The court denied the petition without issuing an order to show cause. Defendant previously appealed, challenging the denial of his petition on the grounds the record of conviction did not establish he was ineligible for relief as a matter of law. Our court agreed, reversed the court's order denying the petition, and remanded with directions for the court to issue an order to show cause and hold an evidentiary hearing.[1] On October 7, 2021, after holding an evidentiary hearing, the trial court denied the petition.

Defendant now challenges the denial of his petition after the evidentiary hearing, arguing the record does not establish the court applied the correct standard of review at the evidentiary hearing and the evidence was insufficient to establish he was ineligible for resentencing. Relatedly, he asserts we should review the court's factual findings de novo.

We reject defendant's contentions and affirm the order denying the petition.

[1]Defendant filed a motion requesting we take judicial notice of our prior two unpublished decisions in this matter, *People v. Valle* (Feb. 14, 2017, F069356) [2017 Cal.App.Unpub. LEXIS 1048; 2017 WL 589109] and *People v. Valle* (June 15, 2021, F081069) [2021 Cal.App.Unpub. LEXIS 3876; 2021 WL 2431338]*,* for purposes of detailing the procedural history of the case. The People do not oppose defendant's request. Pursuant to Evidence Code sections 452, subdivision (d), and 459, and California Rules of Court, rule 8.252, we grant defendant's request to take judicial notice of the referenced opinions.

2.

## FACTUAL AND PROCEDURAL HISTORY

*Procedural Background*

In 2011, defendant and Saul Gonzalez were charged with willfully, unlawfully, deliberately, and with premeditation and malice aforethought, murdering Cipriano Maldonado in violation of section 187, subdivision (a) (count 1). As to defendant, there were multiple enhancements alleged as to the murder count, including that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1) and defendant personally used a deadly or dangerous weapon, to wit: a knife, within the meaning of section 12022, subdivision (b)(1), in the commission of the murder. Defendant and Gonzalez were charged in count 2 with willfully and unlawfully committing an assault upon A.Z. with a deadly weapon, to wit: a knife, in violation of section 245, subdivision (a)(1). As to defendant, count 2 was enhanced by allegations the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members, withing the meaning of section 186.22, subdivision (b)(1), and defendant personally inflicted great bodily injury upon A.Z. within the meaning of section 12022.7. Defendant and Gonzalez were charged in count 3 with willfully, unlawfully, and actively participating in a criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity and did willfully, promote, further, or assist in felony criminal conduct by gang members, in violation of section 186.22, subdivision (a).

The jury convicted defendant of the lesser included offense of second degree murder (count 1). The jury also convicted defendant of assault with a deadly weapon (count 2) and active participation in a criminal street gang (count 3). The jury found true the allegations counts 1 and 2 were committed for the benefit of a criminal street gang

3.

(§ 186.22, subd. (b)(1)).  The jury was unable to reach a verdict on the section 12022, subdivision (b)(1) knife-use allegation as to count 1 and the section 12022.7 great bodily injury allegation as to count 2, and the court later dismissed these allegations. Codefendant Saul Gonzalez was acquitted of all three counts and the lesser included offenses.  Prior to trial, defendant's brother, Ismael Valle, who was jointly charged in all three counts, pleaded no contest to conspiracy to commit assault with a deadly weapon in violation of section 182, and he admitted a gang enhancement, based upon his involvement in the charged incident.

In 2019, defendant submitted a petition for resentencing pursuant to section 1172.6 using a preprinted form.  Without issuing an order to show cause or holding an evidentiary hearing, the court denied defendant's petition in a minute order without providing its basis for the denial.  In the previous appeal, we reversed the court's order denying defendant's petition and remanded with instructions for the trial court to issue an order to show cause and to hold an evidentiary hearing.  On remand, the trial court issued an order to show cause.

Before the evidentiary hearing on the petition, the People filed a brief in which they detailed evidence from trial they argued supported "a factual determination (consistent with the jury verdict of guilty for Defendant … and not guilty for [Saul Gonzalez]) that defendant … was the actual killer, or was at least a major participant who acted with at least reckless indifferen[ce] to human life, as that was proved at trial, beyond a reasonable doubt."  They attached the referenced trial testimony to their brief.

*Trial Transcript*

At the evidentiary hearing, the court relied on the trial transcript in rendering its decision.  (Though the trial court did not detail the matters it relied upon at the hearing on the record, the court subsequently filed a settled statement in our court affirming it relied on the trial transcript.)  We detail the pertinent testimony below.

4.

**Jamie P.'s Testimony**

Jamie P. testified she was at the home of defendant and Thalia Bravo on July 29, 2011, the night before Maldonado's murder. Saul Gonzalez, whom Jamie P. was dating at the time, "Omega," "Toes" (Angel Lopez), Matthew Vega, and defendant's brother Ismael (whom Jamie P. referred to as "BB's" in her testimony) were there. From the time Jamie P. arrived until about midnight, the people in the house "were a little bit drunk and they got a little bit more aggressive with the people that were walking by." Before Gonzalez arrived at the house, defendant, Ismael, and Omega were trying to pick a fight by "banging the opposite hood of where they're from," meaning they were yelling out "Loma" to people walking by to see how they would respond, even though they actually associated with "Okie Bakers" and defendant was an Okie Baker gang member. No one yelled back and there was no fight near the house that night. Jamie P. stated defendant "looked anxious and ready, like energy to go out and fight."

At some point that evening after midnight, Jamie P. got in Bravo's car. Defendant was driving. Bravo, Gonzalez, Vega, Ismael, and defendant's baby girl were also in the car. Jamie P. explained she was sitting on Gonzalez's lap in the backseat on the passenger side. Jamie P. and Gonzalez were going to be dropped off at Gonzalez's house before the others went to get marijuana.

On the way to Gonzalez's house, at an intersection, defendant yelled "Okie" at three males he saw walking; no one else in the car yelled. One of the males walking, "[t]he thinner one with the longer hair" who was later identified as Cipriano Maldonado, "threw up a gang sign," the letter "L." Defendant told the other occupants, "[H]e just threw up the Loma." "[E]verybody had been drinking. Everybody was just kind of hyped up." Defendant sped up and made a right turn and then another right turn before parking. He "seemed excited to fight, anxious to fight." Jamie P. stated Gonzalez did not seem excited. Defendant told "them to get out of the car." Jamie P. explained defendant

5.

is "the oldest one.  He runs them."  At the time of the incident, Jamie P. was 15 and believed defendant was over 21.

Defendant, Gonzalez, Vega, and Ismael exited the car and "ran to where the other three boys were."  Bravo got out of the car and, at Bravo's direction, Jamie P. got in the front passenger seat and held the baby.  Bravo got in the driver's seat and drove in the direction the males had run.  She made a U-turn and parked the car near where defendant, Gonzalez, Ismael, and Vega were fighting the three males they had seen walking.  Jamie P. explained the fight occurred in the center of the street behind the car.

At some point, Jamie P. looked back and saw Gonzalez and defendant engaged in the fight.  She saw Maldonado striking Gonzalez and Gonzalez was striking him back; each exchanged about five swings before Gonzalez stepped back.  She did not see Gonzalez in possession of a knife and did not see him make any motions as if he had one.  After Gonzalez stepped back, Jamie P. saw defendant fight with Maldonado.  She saw defendant strike Maldonado with his right hand in the right ear and neck area, but she did not know defendant had a knife; she knew "when he pulled it back."  She explained, the strike was not a "regular swing," it looked "like a hook."  She then saw blood and noticed Maldonado was severely injured.  Maldonado immediately stopped and grabbed his neck.  Defendant was close to Maldonado, within arm's reach.  Jamie P. did not notice anyone else close to them.[2]  She heard one of the boys that was with Maldonado yell, "'You killed my homey.'"  Jamie P. then saw Maldonado stumble backwards while grabbing his neck before falling.  Gonzalez, Ismael, and Vega went back to the car.  Defendant also walked back towards the car, "but he stood right there staring" at Maldonado bleeding; everybody was yelling for him to get in the car.  Jamie P. testified she did not see blood

---

[2]On cross-examination, Jamie P. recalled reporting to the detectives that Gonzalez was fighting Maldonado before she saw Maldonado bleeding.  She explained they were fighting in the beginning; it looked like Gonzalez was getting beat up.  Gonzalez stepped back and defendant began fighting Maldonado.

on Gonzalez, defendant, Vega, or Ismael, and, initially, she testified she did not see any of them with a weapon. She also denied seeing Maldonado with a weapon when she was watching the fight.

Jamie P. recalled being interviewed by detectives on August 1, 2011, a day or two after the incident. Jamie P. told the detectives she saw defendant strike Maldonado. At trial, initially, Jamie P. stated she did not recall telling the detectives she saw defendant with a bloody knife in his left hand when everyone got back in the car after the incident. But, later, during cross-examination by Gonzalez's counsel, Jamie P. admitted she saw defendant with a knife but she was scared to testify about it and put herself in danger. Jamie P. also reported, when defendant came back to the car, someone "ask[ed] why the guy was stabbed" and defendant had a blank look on his face.

The group returned to defendant and Bravo's residence. In the car, on the way there, "[e]verybody was saying what did you do, what happened, what's going on. Everybody was a little in shock." When they arrived at the house, they all went in. Jamie P. and her friend Maria, who was at the house when the group arrived, wanted to leave, but defendant told them they could not "because the police could see [them] walking and question [them]." At the house, Jamie P. heard one of the males, not Gonzalez, tell defendant to get rid of the knife. Defendant agreed they needed to get rid of it.

Jamie P. stated defendant had a goatee on the date of the incident, but she could not recall what he was wearing. Jamie P. identified an exhibit introduced at trial as the shirt Gonzalez was wearing that night. She confirmed Gonzalez belonged to the tagging crew, TFC. She did not consider Gonzalez and defendant to be close; rather, they had mutual friends. When asked if she had been threatened in any way with regard to testifying in this proceeding, Jamie P. testified Bravo told her she was "gonna be caught in the streets." She also said Bravo told her "when [she] snitch[es] [she'll] be caught slipping in the streets."

7.

**Thalia Bravo's Testimony**

Bravo testified she and defendant had been together for close to 10 years and he is the father of her four children. Bravo confirmed she was present during the fight in which Maldonado was stabbed in July 2011. She testified, initially, she was in the front seat of the car with her two year old, and Gonzalez, Jamie P., Vega, and Ismael were in the backseat. They were at an intersection when the males who were walking "started banging Loma," meaning they were "screaming Loma" and one "threw up an L finger." The males in the car responded. Vega said, "B Dub," which is a tagging crew. Gonzalez said, "TFC." And defendant and Ismael said "Okie." Defendant was "mad"; "when people disrespect him, he doesn't let them. He would defend himself." But Bravo testified she had "never seen him use weapons on anybody."

Defendant then made two right turns and parked the car. Bravo told defendant not to do this and "let's go." She was "screaming at him not to go." Defendant, Gonzalez, Vega, and Ismael got out of the car and ran in the direction of the males who were walking. Bravo denied that defendant ordered anyone out of the car. Bravo moved to the driver's seat and Jamie P. got in the front passenger's seat with the baby. Bravo drove to where the fight was occurring.

Bravo did not see who hit Maldonado, but she saw "the guy walking and he was cut"; she did not recall who was near him because everyone scattered. She later testified she did not see Maldonado's neck cut, but she saw blood dripping down. Defendant, Ismael, Gonzalez, and Vega returned to the car and Bravo yelled at defendant. Bravo testified she did not talk to any of them and could not recall their demeanors; she was in shock. They returned to the house. Bravo denied seeing a weapon or blood on any of the males. She also denied Jamie P. was told she could not leave the house when they got back.

According to Bravo, on the night of the fight, defendant was wearing a white shirt and blue shorts. She did not recall telling Detective Hale defendant did not have facial

8.

hair on the night of the incident. She also identified an exhibit as the shirt Gonzalez was wearing that night. Bravo did not recall defendant yelling out the word "Loma" at people outside at any time that night. She stated she was inside with her children before they got in the car to leave. She denied that defendant, Gonzalez, Ismael, or Vega seemed ready to fight someone when they got in the car that night.

Bravo testified she had seen defendant fight "plenty" of times. They were always fistfights; she had "[n]ever seen him take anything out." Defendant became an "Okie Baker" when he was 13 or 14 years old. Defendant's brother Ismael was also an Okie Baker. She had spoken to defendant at least 50 times when he was in jail and he stated he did not remember what happened. According to Bravo, defendant has always said he did not do it. She mentioned a statement she made that, "they already know," and stated she was referring to the fact "they already knew [her] daughter was in the car."

Bravo reported she heard Jamie P. was going to say in court that she saw defendant do it to help out Gonzalez. Bravo told Jamie, she was "gonna get [herself] in trouble" by lying. Bravo testified there was no way anyone could have seen who stabbed Maldonado from where they were.

### Daniel V.

Daniel V. testified he, A.Z., and Maldonado were walking through an alley on the night of the incident and saw a green car pass. Daniel V. initially testified he could not recall whether the car's occupants said anything; neither he, Maldonado, nor A.Z. said anything. But Daniel V. later stated he heard "OB," which means "Okie Bakers."

When Daniel V. turned and looked, there was a car full of people traveling at a slow pace. Daniel V. responded, "Gage Street" and A.Z. said, "Loma." Gage Street is a Loma Baker gang. Daniel V. denied involvement in the Gage Street or Loma Baker gang. The car kept going and Daniel V., A.Z., and Maldonado kept walking.

9.

A couple of minutes passed before a group approached them.  It was dark and Daniel V. could not see how many people were in the group.  Someone from the approaching group asked if they were from Loma and then a fight ensued.[3]

At some point, Daniel V. realized Maldonado was seriously injured; he saw a lot of blood running down Maldonado's chest.  Daniel V. denied seeing anyone punch Maldonado before he saw all the blood.  But later, Daniel V. testified he saw a guy strike Maldonado before Maldonado started coughing and holding his neck.  He testified the person who struck Maldonado was wearing a red and black plaid shirt.  According to Daniel V., after the first swing by the guy in the plaid shirt, Maldonado had the stab wound.  Daniel V. noticed blood not more than a minute after Maldonado was hit.  Then, the fight continued for 10 more minutes.

Daniel V. stated an exhibit introduced by the People looked like the plaid shirt worn by the person who struck Maldonado.  He did not identify either defendant or Gonzalez as the perpetrator.  Daniel V. first testified he never saw the individual in the plaid shirt with a knife; but then he later stated he saw the guy in the plaid shirt with a knife in his left hand after he struck Maldonado.  Daniel V. also stated he saw another male with a knife who was wearing a black shirt; that male had a goatee.  Daniel V. never saw that person stab anyone.  At trial, Daniel V. testified a photograph of Gonzalez was consistent with his general description of the person who was wearing plaid.

Daniel V. went to Maldonado and held his neck to try to stop the bleeding.  A.Z. was still fighting and, at some point, he said "this is my little cousin.  He's only 15."  The group ran back to their car as A.Z. came toward Daniel V.  Daniel V. laid Maldonado down on the sidewalk.  Daniel V. learned after the fight that A.Z. had also been stabbed.

---

[3]Daniel V. thought the person who said this was wearing black.  Later, he testified someone said, "Where are you from?"  Daniel V. stated he did not know who said this, but it was not the person who struck Maldonado.

**A.Z.'s Testimony**

Like Daniel V., A.Z. testified he, his cousin Maldonado, and Daniel V. were walking when he saw a green four-door Honda pass and then he heard someone say, "OB" or "Okie," meaning Okie Baker. Daniel V. responded, "Gage Street," and A.Z. said, "Loma," though A.Z. denied he was a member or a past member of the Loma Bakers or Loma Gage street gang. The car paused for a second, then drove off. A.Z., Maldonado, and Daniel V. kept walking and they saw four people walking quickly toward them. A.Z. heard one of them say, "Where you from?" A.Z. responded, "Loma."

A.Z. then saw someone wearing a plaid black and red shirt, with a lip piercing, swing at Maldonado; it looked like he punched Maldonado in the throat. Maldonado made a choking noise, held his throat, turned around in a circle, and walked toward Daniel V. A.Z. then started fighting the others. He testified no one fought with Daniel V., they all fought with A.Z. According to A.Z., he "blacked out for a second" because he got mad; he did not recall what happened and could not see anything. He saw the green car pass again and then he heard Daniel V. call his name. He looked over and saw Maldonado's hand go up and blood start pouring out. A.Z. estimated the fight had been going on for three to four minutes at that point. A.Z. ran to Maldonado and then stayed with him. A.Z. yelled, "[H]e's just a kid. He's only 15. It's my little cousin." After the fight was over, A.Z. learned he, too, had been stabbed in the back.

Towards the end of the altercation, A.Z. saw a "light-skinned male" with a knife, not the guy wearing a plaid shirt. As two of the males ran back to the car, A.Z. saw the "light-skinned male" pause for a second and then run off. Defendant's skin color matched that of the "light-skinned male." A.Z. also testified, looking at a photograph of defendant, that defendant's race, approximate age, approximate height, and general hairstyle was in alignment with the light-skinned Hispanic male that he saw with a knife that night. But A.Z. stated he could not recall if either defendant or Gonzalez was involved in the altercation. He testified the "light-skinned male" with the knife was

11.

wearing a short-sleeved black or charcoal gray shirt and had a goatee and gauges in his ears.

**Detective Hale's Testimony**

Detective Hale was the lead investigator assigned to Maldonado's homicide. He testified Jamie P. told him she saw defendant with a knife and she observed him stab Maldonado in the neck. Jamie P. explained, initially, Gonzalez was fighting Maldonado, but "[a]t some point during the fight, I don't know exactly how [defendant] got to this position, but at some point he was standing behind [Maldonado], and with the knife in his right hand stabbed … Maldonado in the right side of his neck." Hale had not told Jamie P. the nature of Maldonado's injury at that point or which side of Maldonado's neck had been cut; but Jamie P.'s statement appeared consistent with the location of the wound. Jamie P. later saw defendant holding the bloody knife in his left hand and she overheard someone mention getting rid of the knife. She reported defendant was wearing either a white or gray shirt the night of the incident. Hale testified he did not give Jamie P. any information from the investigation or tell her what anyone else had told him during her interview.

Bravo was crying during her first interview with Hale on July 30, 2011, and she told him right away that she honestly did not know who did it. She stated she knew who was there, but that she was not there; she was home sleeping. She reported she woke up when the group, including Omega, came home. Hale presented Bravo with a fast food receipt found in her car that showed a 4:00 a.m. timestamp from the date of the incident and told her he had a video of her at the fast food restaurant, even though he did not. Bravo then reported she was in the passenger seat and defendant was driving that night. She stated some words were exchanged from the car, the boys got out to fight, and she drove away without them when she pulled up and saw them fighting. She continued to report "Omega" was at the scene. She stated defendant usually carried a black

12.

pocketknife that was five or six inches long. She reported she was not exactly sure where the pocketknife was, but the usual hiding spot was under the bed. She stated defendant told her Omega was there, but later explained he was not there. She also reported defendant was right-handed.

Bravo reported defendant had a problem with these guys before. She said she had seen one of the guys with a female before; they had come to the house earlier and were threatening them. She asked Hale not to tell defendant what she had told him and that she was "tired of [defendant]'s shit."

Hale testified defendant denied stabbing anyone during his interview and denied he had a knife during the altercation. Defendant talked about "Omega" squaring up with Maldonado. But defendant later stated Gonzalez was squaring up with Maldonado.

Hale testified Gonzalez initially denied being involved in the incident and lied regarding where he was on the night of the incident, saying he was having pizza with a woman named Tonya. Gonzalez said he was wearing a white shirt the night of the incident. But when confronted with the checkered shirt, Gonzalez said he thought he wore that over his white shirt. Gonzalez later admitted to being present during the altercation and discussed who was at the scene.

**Defendant's Testimony**

Defendant testified regarding how he came to join the Okie Bakers gang. He explained he had been in fights and was skilled at fighting. But he had never used a knife during a fight because there was no need; he knew how to defend himself. And he denied ever stabbing anyone.

Defendant denied yelling out "Loma" on the night of the charged incident while at his house. He testified when his car approached the three individuals walking that night, Gonzalez yelled out "TF" for the tagging crew "TFC," which was not a rival of anyone and would not make anyone upset. Then, Ismael yelled out, "Okie." Defendant denied

13.

yelling anything.  A.Z. said "Loma" about two times and someone else flashed a hand sign.  Someone in the car told defendant "pull over, pull over," but defendant kept the car moving.  Gonzalez told defendant, "let's go back."  Defendant turned and parked the car; he did not recall if he said anything.  He denied Bravo told him not to stop or said "let's get out of here."  All the males got out of the car; defendant, Ismael, and Gonzalez were in front and Vega was walking behind.

They approached the three males that were walking and defendant asked A.Z., "where you from?"  A.Z. responded, "Loma," and defendant said "this is Okie."  A.Z. said, "F the Okie," and defendant responded, "F the Loma."  A.Z. threw the first swing, defendant countered the punch, and they started fighting.  Gonzalez was next to defendant and he grabbed A.Z.'s shirt as defendant and A.Z. were fighting.  Defendant testified Vega did not throw any punches; it was defendant, Ismael, and Gonzalez fighting.

Defendant testified he did not realize Maldonado had been injured until he heard Daniel V. yell to A.Z.  Defendant stopped swinging, but A.Z. was still swinging at Gonzalez.  A.Z. ran back and defendant saw Maldonado fall; defendant stated "it shocked me a little bit."  He denied killing anyone or stabbing Maldonado or A.Z.  He also denied having a knife that night.  He testified he felt a little responsible for what had happened in the sense that if he had never turned back, this never would have happened.

Defendant admitted making a statement on a jail call that "Moses killed somebody too and God forgave him," essentially saying why can't God forgive him.  Defendant stated he said this because he felt morally responsible.

Defendant discussed a July 9, 2011, incident (weeks before the charged incident) during which Loma Baker rival gang members disrespected defendant at his house, which was in Loma territory.  Defendant brandished a shotgun at the group in an alley, but he denied pointing it at anyone.  He denied Maldonado was in the group in the alley.  Defendant also denied he knew any of the three individuals who were walking during the

14.

charged incident. Probation Officer Lloyd Knowles testified he saw defendant raise his gun at the group in the alley. When Knowles learned of Maldonado's stabbing, he saw Maldonado's picture and it resembled "[t]he individual in the alley who [defendant] was pointing the shotgun at." Knowles reported this information to Detective Hale.

Defendant also discussed an incident a few weeks before the charged incident during which he was stabbed in the hand by individuals who saw his tattoos. He denied he was mad as a result of the stabbing.

**Gonzalez's Testimony**

Gonzalez was a part of the tagging crew TFC; they would do graffiti. In the months leading up to the charged incident, Gonzalez was spending a lot of time with Bravo's little brother Alberto. Alberto stayed at defendant and Bravo's house. Gonzalez testified he had twice seen defendant engage in gang activity at the house, specifically defendant would "bang" on people walking by, meaning telling "people where they were from," but Gonzalez was not around him; he would be inside the house with Alberto.

The night of the charged incident, Jamie P. and Alberto texted Gonzalez to come to Bravo's house, so he went. He was there for a few hours, then he and Jamie P. planned to go back to his house. Defendant offered to give them a ride on their way to get marijuana. During the car ride, they saw the three guys walking and one of them yelled out "Loma"; defendant responded, "Okie." Bravo told defendant to keep going; defendant looked mad. Defendant "said fuck that, and he said we're going back." Bravo told him not to and was telling him to stop. Defendant parked the car and Bravo was pleading with him not to go; defendant ignored her. Defendant, Ismael, and Vega got out of the car and defendant said "let's go." Gonzalez testified he "stood there for a little bit, and then Jamie turned around and looked at [him], and then [he] just got off the car." Gonzalez did not want to get out of the car but felt if he did not, defendant would beat him up for not listening to him. Gonzalez believed defendant was three years older than

15.

him. Gonzalez testified he was wearing a plaid shirt that night and defendant and Ismael were wearing dark shirts.

They speed-walked down the street and came upon the three males who were walking; A.Z. and Daniel V. were in the front and Maldonado was in the back. Gonzalez was facing A.Z. and defendant was to Gonzalez's right; Ismael was behind defendant and Vega was eight or nine feet back. A.Z. said loudly, "Where you from?" Defendant replied, "Okie." Defendant then said, "[W]here are you from?" A.Z. responded, "Loma" and said, "fuck Okie." Defendant said, "fuck Loma."

Then A.Z. punched Gonzalez in his right cheek and Gonzalez punched him back. A.Z. "was getting the best of" Gonzalez, so Gonzalez backed away. When he backed away, he saw Maldonado lying on the ground. Gonzalez ran back to the car. Before getting in the car, Gonzalez looked back and saw defendant with a knife in his right hand. Vega was already in the car and Ismael got in right after Gonzalez; defendant took a while to get in the car, about a minute. Ismael and Bravo were yelling to defendant to get in the car. Ismael was asking defendant, "[W]hat did you do?" When defendant got back to the car, he took off his shirt with the open pocketknife in his hand and then wrapped the shirt around the knife. Gonzalez did not hear any discussion about getting rid of the knife. Defendant just said let's go.

When they got to defendant's house, defendant told Gonzalez and everybody there not to say anything. Gonzalez took that as a threat. Omega asked defendant what happened and defendant said, "I stuck this fool." Gonzalez testified that is when he knew defendant had done it, because defendant said it "from his own words." Gonzalez was standing right next to defendant when he said it.

After 10 to 15 minutes, Gonzalez left and went home. The next day, he received a text from Alberto that defendant had been arrested. Gonzalez denied striking anyone besides A.Z. and stated he did not see anyone fight with Maldonado.

16.

**Other Evidence Introduced at Trial**

The prosecution introduced law enforcement testimony related to defendant's gang affiliation as an Okie Baker, the gang culture, and tagging crews as well as other evidence relevant to the gang-related charges, including evidence related to Gonzalez's alleged gang affiliation.

There was also testimony defendant was stabbed in the hand on July 12, 2011, 18 days before Maldonado's homicide. Defendant reported the perpetrators were related to the Loma Bakers, but defendant would not give names or specifics to law enforcement and he would not identify the perpetrators despite the police detaining several people.

Additionally, a pathologist testified Maldonado's cause of death was a stab wound to the right side of his neck. He explained there were two wounds on Maldonado's neck: one from behind the ear to the middle of the neck from right to left trailing downwards, and another from the middle of the neck upwards and rightwards from the left to right going from downwards to upwards. Both wounds were fatal. One wound could have been inflicted from behind, but the other could not have. The pathologist opined, if the assailant was in front of the victim, the wounds had to have been inflicted using the assailant's right hand.

*Evidentiary Hearing on Petition for Resentencing*

After the parties presented their arguments at the evidentiary hearing and the court reviewed the trial transcript, the court explained its conclusion:

> "So in this particular case, the People have to prove beyond a reasonable doubt one of three things, the person was the actual killer. I believe the defendant was the actual killer. I think the evidence is overwhelming. It's conflicting, but as the Fifth District pointed out in their initial opinion, there's substantial evidence that he was the killer. So … given that, the petition will be denied. The evidence—it depends on who you believe, but given the overall evidence, I think he was the actual killer."

The court also considered alternative theories that would render defendant ineligible for relief:

"The person was not the actual killer but with intent to kill, aided and abetted. I don't know if the People can go forward on that one. The third … way of which it could be proven is … the defendant was a major participant in an underlying felony and acted with reckless indifference to human life as described in 190.2. I'm not sure what the underlying felony would be in this case. It was a gang—any time two gangs get together and start fighting, you are acting with indifference to human life. This Court has over and over and over again, not me, not my own courtroom this whole Kern County Court, has case after case after case involving murders and other attempted murders and assaults with gang members attacking each other. So any gang member who is involved in a fight against another gang member or gangs, they are acting with indifference to human life it seems. And in this case, the defendant all he had to do was drive away. The mother of his child Ms. Bradwick [*sic*] I think it is. The testimony I believe was drive away . All he had to do was drive away, and not feel this disrespect and we wouldn't be here today. And this young man, this 15-year-old, would be alive. He was clearly a major participant when he drove back to the victim. He—there's some evidence he said, let's go, or something along those lines, and he directed the attack. So he was a major participant.

"If the underlying felony can be the gang [charge] as [the prosecutor] indicated [*sic*]. So any way, the petition is denied. The People have proved this beyond a reasonable doubt."

Based on its findings, the court denied defendant's petition for resentencing.

**DISCUSSION**

**I.      Senate Bill 1437 and Senate Bill No. 775**

On September 30, 2018, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Accordingly, section 188 now provides that, "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime*." (§ 188, subd. (a)(3), italics added.) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, section 189 previously stated, "All murder … which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." Senate Bill 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

The legislation also added section 1172.6 (former § 1170.95), which provides a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, § 4.) Initially, section 1172.6 (former § 1170.95) permitted those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder

conviction vacated and to be resentenced on any remaining counts ….'" (Stats. 2018, ch. 1015, § 4, subd. (a).)

In Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective January 1, 2022, the Legislature amended the language of this section to expand the scope of the petitioning procedure. (Stats. 2021, ch. 551, § 2.) Under the amended statute, if the petitioner has made a prima facie case for relief, the court "shall issue an order to show cause." (§ 1172.6, subd. (c).) Within 60 days after the order to show cause has issued, the trial court must then hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).)

> "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."
> (§ 1172.6, subd. (d)(3).)

20.

## II. Trial Court Applied the Correct Standard of Review at the Evidentiary Hearing

Defendant first argues the matter must be remanded for a new evidentiary hearing because it is unclear whether the court applied the correct standard of proof in rendering its finding. We conclude the record reflects the court applied the correct standard.

### A. Relevant Procedural History

At the beginning of the evidentiary hearing, the court noted "[t]he People … have the burden of proof beyond a reasonable doubt that the defendant is not eligible for resentencing." Defense counsel repeatedly argued the court's role was to determine whether or not there was sufficient evidence to say defendant is guilty of murder beyond a reasonable doubt. And, before rendering its decision, the court again reiterated, "the People have to prove beyond a reasonable doubt one of three things, the person was the actual killer. I believe the defendant was the actual killer. I think the evidence is overwhelming. It's conflicting, but as the Fifth District pointed out in their initial opinion, there's substantial evidence that he was the killer." And, finally, at the conclusion of the hearing, the court stated "the petition is denied. The People have proved this beyond a reasonable doubt."

### B. Analysis

Defendant argues we should "reverse the ruling as based on improper grounds and utilizing an improper standard." He relies on the court's reference to the direct appeal in which our court mentioned there was substantial evidence defendant was the actual killer in discussing whether defendant was prejudiced by the court's failure to sua sponte instruct the jury on other-crimes evidence pursuant to CALCRIM No. 375.

While there was previously a conflict among the appellate courts regarding the appropriate burden of proof at the evidentiary hearing, the record here establishes the court applied the correct burden of proof at the evidentiary hearing. Senate Bill 775 clarified the burden at the evidentiary hearing is on the People to establish beyond a

21.

reasonable doubt that defendant is guilty of murder under the amended laws. (See § 1172.6, subd. (d)(3) ["At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder … under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.… A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing"].) And, here, the court expressly twice stated the People proved defendant was ineligible for relief beyond a reasonable doubt, specifically because he was the actual killer. Accordingly, the court denied the petition on that basis. Thus, we cannot conclude, as defendant contends, that the record is unclear about whether the court applied the correct standard of proof at the evidentiary hearing. (See *People v. Oliver* (2023) 90 Cal.App.5th 466, 481, fn. 6 [rejecting claim court applied incorrect standard at evidentiary hearing where "court started and ended the hearing by indicating the burden was on the prosecution to 'prove ineligibility beyond a reasonable doubt'"], petn. for review pending, petn. filed May 18, 2023, S280052.)

Additionally, it is true the court noted in the direct appeal our court "pointed out" there was substantial evidence defendant was the actual killer. However, this statement, read in context, does not appear to cast doubt on whether the court applied the correct standard considering the court's repeated assertions regarding the applicable standard of review and its conclusion the People had met their burden beyond a reasonable doubt. Rather, the court seemed to reference the appellate court opinion to support the validity of its conclusion that the People had proven beyond a reasonable doubt that defendant was the actual killer.

On this record, we reject defendant's contention the court applied the wrong standard of review at the evidentiary hearing.

## III. Sufficient Evidence Supports the Trial Court's Finding

Defendant urges us to independently review the record because this is a "cold record" case, and we should find insufficient evidence supports the trial court's conclusion he was ineligible for relief as the actual killer or a major participant who acted with reckless indifference to human life. The People respond that we should review the trial court's findings for substantial evidence, and they contend the record supports the trial court's conclusion that defendant was the actual killer. We agree with the People regarding the appropriate standard of review and conclude substantial evidence supports the trial court's finding defendant was the actual killer.

### A. We Review the Court's Findings for Substantial Evidence

First, we address the applicable standard of review, given that this is a point of contention between the parties. Notably, defendant asserts we should independently review the trial court's factual findings since they were based on a "cold record," relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*). In that case, Vivar filed a motion to vacate his 2002 conviction under a recently enacted statute, section 1473.7, that offers relief to those who had served their sentences and where the conviction or sentence is legally invalid due to "*prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea. ([§ 1473.7], subds. (a)(1), (e)(1).)" (*Vivar*, at p. 517.) The trial court denied Vivar's motion, finding counsel made no affirmative misadvisement, and "nonadvisement" of immigration consequences did not qualify as ineffective assistance. (*Id.* at pp. 520–521.) The appellate court reviewed the trial court's order for an abuse of discretion and affirmed on different grounds, concluding that while counsel was ineffective by failing to offer Vivar competent advice about immigration consequences in 2002, Vivar failed to demonstrate any prejudice from the error. (*Id.* at p. 521.)

The California Supreme Court reversed and directed the appellate court to remand for the trial court to grant Vivar's motion, concluding, based upon its independent review

of the record, the court of appeal erred in concluding Vivar had failed to establish prejudice. The *Vivar* court explained its "embrace of independent review in this context" (11 Cal.5th at p. 526) was based upon the history of section 1473.7, the interests at stake in a section 1473.7 motion—that is, "the profound and substantial consequences of a prejudicial misadvisement on a defendant's life" (*Vivar*, *supra*, at p. 524)—the type of evidence on which a section 1473.7 ruling is likely to be based—where the judge adjudicating the motion may never have participated in the underlying proceedings that occurred years earlier and must rely on a cold record—and the relative competence of trial courts and appellate courts to assess that evidence. (*Vivar*, *supra*, 11 Cal.5th at pp. 526–527.) The *Vivar* court also explained, "Whether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, are predominantly questions of law." (*Id*. at p. 524.)

In a footnote, the *Vivar* court explained the limited nature of its holding: "Our decision addresses only the independent standard of review under 1473.7. Nothing we say here disturbs a familiar postulate: when reviewing a ruling under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court,' regardless of 'whether the trial court's ruling[s are based] on oral testimony or declarations.' [Citations.]" (*Vivar*, *supra*, 11 Cal.5th at p. 528, fn. 7.)

Multiple courts have rejected the argument that a trial court's findings at a section 1172.6 evidentiary hearing, when based on a cold record, should be reviewed independently in light of *Vivar*. (See *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1109; *People v. Oliver*, *supra*, 90 Cal.App.5th at pp. 479–480; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590–591 (*Mitchell*); *People v. Clements* (2022) 75 Cal.App.5th 276, 283, 302 (*Clements*).) These courts have instead concluded, whether the defendant is ineligible for resentencing is predominantly a factual question reviewable for substantial evidence. (See *Werntz*, *supra*, at p. 1109 ["the questions we face on a review from a court's denial of a section

24.

1172.6 motion are primarily factual" and "the factors that persuaded the court in *Vivar* to apply independent review are not at play here"]; *Oliver*, *supra*, at p. 480 [distinguishing *Vivar* and concluding "[w]hether Oliver was a major participant in the underlying felonies who acted with reckless indifference to human life is predominantly a factual question reviewable for substantial evidence"]; *Sifuentes*, *supra*, at pp. 232–233 [rejecting application of the independent standard of review as in *Vivar* and concluding whether petitioner knew or reasonably should have known the victim was a police officer under resentencing statute was predominantly factual question reviewable for substantial evidence]; *Mitchell*, *supra*, at pp. 590–591 [distinguishing *Vivar* and concluding "[s]ubstantial evidence support[ed] the finding, beyond a reasonable doubt, that Mitchell was a major participant in a felony who acted with reckless indifference to human life"]; *Clements*, *supra*, at pp. 283, 302 [distinguishing *Vivar*; concluding "the trial judge sits as a fact finder at a hearing under section 1170.95, subdivision (d) [now § 1172.6, subd. (d)] and that substantial evidence support[ed] the trial judge's finding beyond a reasonable doubt that Clements committed implied malice second degree murder"].)  We agree with our sister courts and conclude *Vivar* does not compel us to apply an independent standard of review of the court's findings below, which were predominantly findings of fact.

The other cases relied upon by defendant are also inapposite.  (See *People v. Avila* (2006) 38 Cal.4th 491, 529 [dismissal of juror for cause based solely on documentary evidence was subject to de novo review]; *People v. McKinnon* (2011) 52 Cal.4th 610, 647 [same]; *People v. Thompson* (2010) 49 Cal.4th 79, 100 [same]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [applying independent standard of review in considering challenge to denial of parole based on documentary evidence]; *In re Serrano* (1995) 10 Cal.4th 447, 457 [independently reviewing habeas corpus petition]; *In re Cudjo* (1999) 20 Cal.4th 673, 688 [reviewing independently referee's resolution of mixed questions of law and fact in petition for writ of habeas corpus]; *People v. Booth* (2016) 3 Cal.App.5th 1284, 1305–1306 [declining to defer to trial court's credibility determination related to

ineffective assistance claim where court never saw witness but based its assessment on documentary evidence]; *In re Honesto* (2005) 130 Cal.App.4th 81, 94 [independently reviewing denial of parole based upon documentary evidence]; *In re Smith* (2003) 114 Cal.App.4th 343, 360–361 [same]; *In re Lowe* (2005) 130 Cal.App.4th 1405, 1421 [same].) That is, "[n]one of these situations is akin to resentencing." (*People v. Werntz*, *supra*, 90 Cal.App.5th at p. 1110.) Rather, we conclude *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*) is more analogous to the present situation and dictates the applicable standard of review.

In *Perez*, the trial court determined the defendant was eligible for resentencing after the passage of Proposition 36, but the appellate court reversed. (*Perez, supra*, 4 Cal.5th at p. 1059.) The *Perez* court affirmed the appellate court's conclusion the defendant was armed with a deadly weapon during the commission of the current offense and he was, thus, ineligible for resentencing.[4] (*Perez*, at p. 1059.) In considering the issue, the *Perez* court held the appellate court "correctly observed that the trial court's eligibility determination, to the extent it was 'based on the evidence found in the record of conviction,' is a factual determination reviewed on appeal for substantial evidence."[5] (*Id*. at p. 1066.) In so holding, the *Perez* court rejected the argument "de novo review is more appropriate because trial courts do not have an advantage over appellate courts in determining eligibility based on the record of conviction." (*Ibid*.) Instead, it held "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, the question whether a defendant was armed with a deadly weapon during his

---

[4]Under the Three Strikes Reform Act of 2012 (Prop. 36), an inmate who has been sentenced under the "Three Strikes" law for a nonserious, nonviolent felony may petition the trial court for resentencing. (§ 1170.126, subds. (e)–(f), *Perez, supra*, 4 Cal.5th at p. 1059.)

[5]The *Perez* court explained, in the Proposition 36 resentencing context, as here, "once an inmate has made an initial showing of eligibility for resentencing, the burden is on the prosecution to prove beyond a reasonable doubt that one of the grounds for ineligibility applies." (*Perez, supra*, 4 Cal.5th at p. 1062.)

or her current offense remains a question of fact, and we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid*.)

Here, as in *Perez*, defendant's eligibility for resentencing hinges on a question of fact: whether defendant was the actual killer. Thus, as in *Perez*, we "must defer to the trial court's determination if it is supported by substantial evidence." (*Perez*, *supra*, 4 Cal.5th at p. 1059; accord, *Clements*, *supra*, 75 Cal.App.5th at p. 298; *Mitchell*, *supra*, 81 Cal.App.5th at p. 591.) Put differently, as the reviewing court, we must determine if there was sufficient evidence for the trial court to conclude the prosecutor proved the petitioner is ineligible for resentencing beyond a reasonable doubt. (*Perez*, *supra*, at p. 1066; accord, *Clements*, *supra*, at p. 298.)

### B.     Sufficient Evidence Supports the Court's Findings

Accordingly, our inquiry next turns to whether sufficient evidence supports the trial court's conclusion defendant was the actual killer such that he was ineligible for resentencing on that basis.[6] Defendant asserts the evidence was insufficient on the "written record, without live witnesses to determine credibility" that he, as opposed to Gonzalez, stabbed Maldonado. He asserts "[o]ne could speculate, based on the not guilty verdict of Gonzalez, that by the process of elimination it had to be [defendant]. But that is not enough to find it true beyond a reasonable doubt." He points to conflicts in the testimony, specifically A.Z.'s and Daniel V.'s testimony that they saw the person in the plaid shirt and lip piercings hit Maldonado in the throat. He also argues the jury clearly

_____

[6]We note defendant additionally argues there was also insufficient evidence he was a major participant who acted with reckless indifference to human life. As the People note in their response, Maldonado's murder was not committed during the commission of a felony specified in section 189, subdivision (a). Thus, defendant could not be convicted of murder under the amended law based upon a felony-murder theory (and, indeed, was not prosecuted under a felony-murder theory at trial). Furthermore, as discussed further in this part, we conclude sufficient evidence supports the trial court's conclusion defendant was the actual killer and, thus, ineligible for resentencing. For these reasons, we do not address the sufficiency of the evidence to establish defendant was a major participant who acted with reckless indifference.

27.

found insufficient evidence he was the actual killer in that it "split 6-6 on the weapon enhancement." The People respond, "[a]lthough the jury trial involved numerous evidentiary conflicts, substantial evidence supports [defendant's] role as the actual killer." We agree with the People.

As discussed, when reviewing the sufficiency of the evidence, "'[o]n appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."'" (*Id.* at p. 508.)

Applying this standard, we conclude substantial evidence supports the trial court's finding that defendant was the actual killer and, thus, ineligible for resentencing. Here, it was undisputed defendant was involved in the group fight during which Maldonado was killed. And, Jamie P. testified and reported after the incident that she actually saw defendant stab Maldonado. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) Additionally, she reported seeing defendant return to the car with a bloody knife and hearing him discuss getting rid of it. A.Z. and Daniel V. also testified they saw an individual with a goatee and wearing a dark shirt—descriptions that could be construed as matching defendant's appearance at the time of the incident—with a knife in his hand following Maldonado's stabbing. Moreover, defendant stated on a jail call, "Moses killed somebody *too* and God forgave him" (italics added), which a rational trier of fact could conclude was an implicit admission that defendant had killed someone. Notably, there was also evidence A.Z., who was with Maldonado, called out, "Loma," the name of a gang that was a rival of defendant's gang before the fight began; defendant was angry as a result; and defendant

28.

usually carried a pocketknife. Additionally, there was evidence defendant had been stabbed by a member of the Loma gang weeks prior to Maldonado's murder; and defendant had previously brandished a gun toward a group of people associated with the Loma gang earlier that month.

Viewing such evidence in the light most favorable to the trial court's finding, as we must, we conclude there was sufficient evidence to support the trial court's conclusion defendant was the actual killer. Put differently, we cannot conclude that ""upon no hypothesis whatever is there sufficient substantial evidence to support"" the court's finding that defendant was the actual killer. (*People v. Cravens*, *supra*, 53 Cal.4th at p. 508.) To the extent there were discrepancies in the evidence, "'[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.…'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) And, the mere fact the record could support a contrary finding does not diminish the substantial evidence supporting the trial court's finding. (See *People v. Romero* (2008) 44 Cal.4th 386, 400.)

Notably, defendant emphasizes the jury's failure to reach a verdict on the personal use of a knife allegation attached to the murder count to argue the jury did not conclude he was the actual killer. But the jury did not acquit defendant of the weapon-use enhancement attached to the murder count, it merely deadlocked. And "[a] hung count is not a 'relevant' part of the 'record of [the] prior proceeding." (*Yeager v. United States* (2009) 557 U.S. 110, 121, 122 ["consideration of hung counts has no place in the issue-preclusion analysis"]; *Brown v. Superior Court* (2010) 187 Cal.App.4th 1511, 1524 [same].) Rather, "[b]ecause a jury speaks only through its verdict, its failure to reach a verdict cannot—by negative implication—yield a piece of information that helps put together the trial puzzle." (*Yeager*, *supra*, at p. 121.) This is because "[a] host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to

name but a few—could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork." (*Id.* at pp. 121–122, fns. omitted.) Thus, contrary to defendant's contention, we cannot conclude the jury's failure to reach a verdict as to the personal use of a knife allegation attached to the murder count means it necessarily decided he was not the actual killer such that the trial court was precluded from reaching this conclusion. (See *People v. Wilson* (2023) 90 Cal.App.5th 903, 905 [jury's inability to reach verdict on personal use and discharge of firearm allegation did not preclude trial court from finding prosecution proved beyond a reasonable doubt defendant was actual killer at evidentiary hearing on petition for resentencing], petn. for review pending, petn. filed May 22, 2023, S280087.)

Because we conclude substantial evidence supports the trial court's conclusion defendant was the actual killer, we reject defendant's contention the court erred in denying his petition for resentencing.

## DISPOSITION

The court's order denying defendant's section 1172.6 petition for resentencing is affirmed.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.

30.